# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| ROBERT M. BRAGG, | ) | Civil Action No.:  2:24-cv-621-RMG-MGB |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **Violation of Title VII:** |
| vs. | ) | **Termination Based Upon Gender** |
| | ) | **Retaliation** |
| WALGREENS BOOTS ALLIANCE, INC., | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1.      That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2.      That, upon information and belief, the defendant Walgreens Boots Alliance, Inc. ("Walgreens" or "defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3.      That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 2000e-2, 3 and 5 (The Civil Rights Act of 1964  or "Title VII") and 28 U.S.C. § 1331.

4.      That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business in said district, plaintiff resides in the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

## CONDITIONS PRECEDENT

5.    That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.    That at all relevant times as defined by Title VII defendant employed fifteen (15) or more employees as required by Title VII.  As such, the defendant is an "employer" as defined by Title VII and is otherwise subject to and covered by said Act.

7.    That on or about September 12, 2023, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation (all in the form of termination) based on gender.

8.    That on or about August 23, 2024 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.    That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.    That plaintiff is a Caucasian male.

12.    That before working at defendant, plaintiff worked for Rite Aid and CVS as a pharmacist and then as a Pharmacy Manager.  Plaintiff always ended up working in high-volume stores and has a strong track record of growing the company's business at each such store.  Oftentimes, management would observe plaintiff's ability to perform at a high level in

busy and stressful environments and they would seek plaintiff out and assign plaintiff to such locations. Other times, plaintiff's skillset and hard work would convert a lower-producing store where he worked into a high-volume store. (For example, plaintiff was able to convert a lower-volume store into a high-volume one by significantly increasing prescription volume.)

13.    That in or around February of 2017 defendant hired plaintiff, initially as a floater pharmacist in the northwest Alabama district. Within a few months, plaintiff was asked to be the Pharmacy Manager at Walgreens' Store 2363 in Madison, Alabama, a 24-hour pharmacy.

14.    That while working for his prior employer, CVS, plaintiff had been assigned to work at a store in South Carolina. While at the store, plaintiff came to like the area and he wanted to return to South Carolina if possible. As such, plaintiff advised defendant's management of his desire to return to South Carolina and, in or around the fall of 2018, Walgreens assigned plaintiff to work in the Charleston, South Carolina area, first as a floater pharmacist and then as the interim Pharmacy Manager at Walgreens in Okatie, South Carolina.

15.    That the Okatie store (like the others where plaintiff worked) was a high-volume one and, as always, plaintiff performed at a high level there – performance that did not go unnoticed by upper management as, by March of 2019, defendant assigned plaintiff to work as the Pharmacy Manager at Store 11434 at 1630 Red Bank Road in Goose Creek, South Carolina, where plaintiff grew the pharmacy business to become one of the highest-volume pharmacies in its district and where plaintiff stayed until his wrongful termination from the defendant in February of 2023.

16.    That as the Pharmacy Manager at Walgreens' Goose Creek store, plaintiff had several different positions reporting to him including one non-managerial pharmacist,

3

Russell Huiet ("Huiet") (male); a Pharmacy Operations Manager, Emma Adkins ("Adkins") (female); and eight (8) or nine (9) pharmacy technicians, two (2) of which were state certified technicians, and most of which were female. All of the technicians reported directly to Adkins.

17.    That plaintiff also had the authority to hire, discipline, fire and oversee all employees under him in the chain of command. For her part, Adkins, as Pharmacy Operations Manager, had full authority to hire, discipline and fire all of the pharmacy technicians who reported to her. She was also tasked with giving the pharmacy technicians their annual performance evaluations.

18.    That going up the chain of command, plaintiff reported directly to the Store Manager, Margaret "Pegi" Becker ("Becker") (female). Becker, in turn, reported to the District Manager who initially was Desmond Garner ("Garner") (male). However, in or around July or August of 2022, defendant fired Garner (upon information and belief without cause) and replaced him with Lenore Landrum ("Landrum"), a female. Landrum lived in Myrtle Beach, South Carolina but worked out of one of the defendant's Mt. Pleasant, South Carolina stores. Garner, and later Landrum, both reported to the Area Director of Pharmacy and Retail, another female, Christina Muller ("Muller"). For her part, Muller reported to Nicole Williams ("Williams"), a female Regional Vice-President who worked out of Charlotte, North Carolina. And in March of 2021, the company hired a new female CEO, Rosalind Brewer ("Brewer").

19.    That in addition to those in plaintiff's chain of command, other employees of defendant that plaintiff dealt with near the end of his employment there included, but are not limited to, Kim Breece ("Breece") (female), Walgreens' Manager of Asset Solutions, who worked out of Columbia, South Carolina and who at all times referred to herein was performing human resource duties. Finally, when plaintiff appealed or grieved his termination, he had some

post-termination communications with an Employee Relations employee at defendant, Melissa Wong ("Wong"), another female who worked out of Deerfield, Illinois.

20. That as far as plaintiff's job performance and employment record at defendant, by all accounts plaintiff performed his job duties there at a level that met or exceeded defendant's legitimate performance expectations. Plaintiff received overall strong ratings on his last three (3) employment evaluations at defendant, with overall scores of "meets expectations" on his 2020 annual performance evaluation and overall scores of "above satisfactory" or "exceeds expectations" on his 2021 and 2022 performance reviews. Moreover, plaintiff consistently met all of the goals and metrics imposed upon him at defendant and plaintiff was otherwise well liked by his staff and by most of upper management. And in the six (6) or so years that plaintiff worked at defendant, he was only disciplined on one (1) occasion, many years ago, when plaintiff was placed on a performance improvement plan because his store was not making its regular "to do" lists – a nonserious circumstance that plaintiff cured immediately.

21. That other than the above, after plaintiff's last performance evaluation in September of 2022, just five (5) months before plaintiff was fired, the author of plaintiff's annual performance evaluation that year, Becker, told plaintiff that plaintiff had received the highest, or one of the highest, overall scores on his 2022 evaluation out of all the other Pharmacy Managers in the area. That same year (2022) plaintiff's Store Manager also nominated plaintiff for the District Patient Care Award – an award plaintiff won that year.

22. That although plaintiff was a manager at defendant at several different locations, the company never provided plaintiff with any handbooks, manuals, operating procedures, or any other written policies. After plaintiff was fired, he went online and discovered a Code of Conduct and Ethics handbook (which plaintiff had never seen before). The

Code of Conduct book, like most, was worded in general terms and only dealt with topics such as conflict of interest, respect in the workplace, marketing its products honestly and trade laws. One page inside the Code of Conduct book mentioned discrimination and harassment, but it only did so in a brief and cursory fashion, giving short, one-sentence examples and definitions of harassment and discrimination and stating that, in general, such conduct was prohibited at Walgreens. The Code of Conduct manual did ***not*** contain full harassment, discrimination or retaliation policies, any sexual harassment policies, policies on gender discrimination, or policies which define a supervisor's duty to report horseplay or harassment. And, it wholly lacked policies on discipline and discharge, let alone provide guidance to supervisors in regard to when they should use formal discipline, the type or kind of discipline they could or should use, or when to report an alleged offense to upper management. Plaintiff was also able to view some pages from a Human Resource manual which contained a more traditional and developed harassment and discrimination policy but, again, plaintiff had never seen the policy while employed at defendant.

23. That plaintiff does recall some brief training on discrimination and discipline at his orientation when he was first hired by defendant and having to take a short online quiz or test each year which dealt with some of the above issues. But plaintiff's orientation and annual training were cursory and brief. For example, plaintiff typically completed his annual training in about 30 minutes or less. However, these issues were never a concern for plaintiff as he was blessed with hardworking employees and a productive team at his store. If something did come up with an employee, it tended to be minor and quickly resolved by informal, verbal coaching with the employee, without the need to escalate the discipline.

24.     That all in all, plaintiff felt he flourished in his role as a Pharmacy Manager at Walgreens' Goose Creek, South Carolina store.  Plaintiff liked the people he worked with, plaintiff had a good relationship with his Store Manager there and others in upper management, and plaintiff truly liked and took an interest in the wellbeing of his customers at the pharmacy. For example, though not required, every December plaintiff would send out over 200 holiday cards to patrons of his pharmacy.

25.     That still, at some point plaintiff noticed an undercurrent of an animus towards male employees at defendant and favorable treatment of female employees there.  In the beginning it was not obvious or blatant, but it was enough to concern plaintiff, and it was based, in part, on the following:

- ❖ The female-dominated makeup and culture at the defendant and plaintiff's observation that virtually all upper-management employees from plaintiff's Store Manager to the CEO were female;

- ❖ Some of the upper management female employees were strong advocates of women's rights.  For example, plaintiff became aware that Landrum was the Communications Lead for Region 23 of the Women of WBA chapter (a Walgreens organization whose stated mission is to support Walgreens in becoming the employer of choice for women in the Carolinas).  Plaintiff also observed that Landrum regularly sent emails promoting Women of the WBA events.  And plaintiff had also learned that the new CEO, Rosalind Brewer, had made discriminatory remarks against white men during a CNN interview in 2015 when Brewer was the CEO of Sam's Club;

- ❖ Plaintiff also saw that whenever a lower-level female employee made a complaint or report against a male pharmacist, Pharmacy Manager, or even a District Manager, regardless of the merit of the complaint, Walgreens management would side with the female employee instead of backing its managers when justified.  Plaintiff further noticed that, in such circumstances, male management employees would typically be disciplined, fired, or forced to leave and that defendant *always* replaced the male management employee with a female; and

- ❖ At some point plaintiff learned that Field Leadership's bonus had a Diversity, Equity and Inclusion (DE&I) component, in that ten (10%)

percent of their potential bonus was specifically tied to increasing the number of females in management/leadership positions. In fact, defendant had publicly stated a goal to increase the number of women in management positions by three (3) percentage points year over year. *For fiscal year 2022, Walgreens missed the three (3) percentage point target.*

26. That nevertheless, plaintiff and his team were still performing at a high level, plaintiff's pharmacy was doing well, and plaintiff and his team were meeting their metrics. Still, plaintiff had enough of a concern about the above circumstances that he began to feel as though he was one female complaint away from losing his job, regardless of the merit of the complaint. This, of course, may have had the effect of inhibiting plaintiff's management style when it came to dealing with his female employees.

27. That plaintiff's passing observations regarding a bias against men at defendant started to become real when defendant assigned Alesha Gantt ("Gantt"), an African-American female, to plaintiff's store to work there as a technician. Gantt, who had been working as a technician at another Walgreens store, was an outspoken employee who regularly engaged in horseplay, who regularly used colorful and inappropriate language in the workplace, and who also had attendance issues. Much of Gantt's conduct took the form of joking, horseplay, attention seeking, and trying to impress those that worked with her.

28. That plaintiff only witnessed a handful of Gantt's misconduct in the workplace. The rest of plaintiff's knowledge came from technicians telling plaintiff stories about Gantt's behavior – oftentimes stories about events which happened months ago. And the technicians would always tell plaintiff about Gantt's conduct in casual conversations. They never complained to plaintiff that she was harassing or discriminating against them. Still, during Gantt's first three or so months at the defendant's store in Goose Creek, her conduct included, but was not limited to, the following:

a)  She approached plaintiff in the store and inappropriately asked, "You take Adderall too?" Although plaintiff does not know where Gantt obtained this information, she may have gotten it from plaintiff's highly-confidential medication profile at the store;

b)  She would leave work early, show up to work late, and sometimes she would be away from the work premises in the middle of the work day for hours, always claiming she had to care for her children on those occasions;

c)  She showed another female employee a picture she had on her phone of a man's penis;

d)  Without warning, she thrust her cellphone into plaintiff's face in an attempt to show plaintiff a picture of a vagina, stating that some girl had sent the picture to her son.  Of course, plaintiff did not look at the picture and firmly told Gantt that her conduct in this regard was **not** OK;

e)  She told plaintiff that her nephew had hacked her phone, gained access to some of her nude pictures, and sent those pictures to himself;

f)  She told other technicians to not walk down a particular bay because she had just passed gas there;

g)  Whenever she got close to or inadvertently came into contact with another female technician in the course of working, she would jokingly exclaim, "I'm not dyking."  When the Pharmacy Operations Manager, Adkins, heard this remark, she would direct Gantt to stop using the term, but Adkins never reported it;

h)  On one occasion plaintiff found a nose stud on or in the keyboard of the pharmacy's cash register and learned that it was Gantt's;

i)  On another occasion Gantt asked plaintiff to look at her belly button because she had a piercing there and thought it might be infected. Plaintiff quickly turned his head away from her and told Gantt in a firm and direct manner to stop engaging in that type of conduct in the workplace; it was not the place to engage in such antics; and that she needed to have a physician look at it; and

j)  On one isolated occasion that occurred when Gantt first transferred over to the Goose Creek store, Gantt had observed plaintiff being firm with a pharmacy customer.  After the encounter, Gantt, who had witnessed the entire exchange and who apparently was impressed

with the way plaintiff handled himself, complimented plaintiff by saying that the customer was going to bring the "nigga" out in plaintiff yet (or words to that effect). Plaintiff never heard her use the word again. Unbeknownst to plaintiff, Gantt also used the term around the Operations Manager, Adkins, the Store Manager, Becker, and some of the pharmacy technicians. However, none of those employees who heard it reported it to plaintiff, or anyone else for that matter. For his part, plaintiff did not report it either as, given the context of the remark, i.e. it was used by a Black woman in a joking or complimentary manner, one time, and she used the term with an "a" at the end of it. Moreover, plaintiff did not believe Gantt was harassing him, creating a hostile environment in the workplace, discriminating against plaintiff, or treating him or any other employee differently in any way. In fact, Gantt was friendly when she made the remark to plaintiff. Plaintiff did not believe she had violated defendant's discrimination and harassment policies – if there even was one - and plaintiff did not believe he had the duty to report it.

29.    That Gantt did not hide the above conduct. She did it in front of all of the other employees, regardless of their race or gender. No one complained to plaintiff that Gantt was harassing them or that they were offended by her actions. On the whole, plaintiff thought Gantt had some potential to become a valuable employee at defendant. Thus, based upon the few events plaintiff witnessed and what he had been told about by others, in plaintiff's discretion as Pharmacy Manager of the store, he decided to address Gantt's conduct by verbally coaching and admonishing her on at least two (2) different occasions during Gantt's first three (3) months at the store (when her conduct was at its worse). At the same time, plaintiff sent text messages to his District Manager at the time, Garner, reporting Gantt's conduct to him, and plaintiff also reported Gantt's conduct to his Store Manager, Becker. Apparently plaintiff's meetings with Gantt resonated with her as, by the early summer of 2021, Gantt ceased engaging in her obnoxious behavior.

30.    That unfortunately, while Gantt's conduct as described above improved significantly, she continued to struggle with working her scheduled shifts and with other

performance-related issues.  In the fall or winter of 2021, plaintiff began to notice that when Gantt showed up for work she smelled like cigar smoke and perfume.  And the smell was not light or appropriate.  It was so strong that it made plaintiff (and others) sick.  It got to the point that when plaintiff worked around Gantt, he would get headaches and become nauseous.

31.    That when it got to the point that customers and other technicians were complaining about it to plaintiff, plaintiff verbally counseled Gantt about her overwhelming odor.  Apparently defendant has a policy which prohibits the use of excessive perfume at work, but it does not have any such policy regarding tobacco, at least not at its retail community pharmacies.  After plaintiff addressed the issue with Gantt, Gantt, who was familiar with the policy in question, fixed the issue in regard to the perfume, but she continued to come to work with a strong smell of smoke on her body and clothing.

32.    That at the same time, Gantt complained about plaintiff to another pharmacist, Joe Longo ("Longo"), falsely telling Longo that plaintiff was trying to force her to quit smoking and seeking advice from Longo about whether she should report plaintiff to Human Resources.  Upon information and belief, Longo advised Gantt that she was always free to make a report to Human Resources, but advised Gantt that, in his opinion, such action was not necessary in this case.  Ultimately, Gantt took Longo's advice and did not report plaintiff to anyone else at the time.  For plaintiff's part, when he tried to get assistance from Landrum, Muller and Human Resources on the tobacco issue, at first they ignored plaintiff.  When plaintiff pressed the issue, they gave plaintiff direction that made little sense, telling plaintiff he could not counsel Gantt further because he did not have the authority to tell her to quit smoking (essentially adopting Gantt's misplaced position).  Of course, plaintiff was not telling Gantt to quit smoking.  Plaintiff was telling her to control the odor from the smoke for the sake of his

health as well as the health of the other employees at the store and its customers. Unfortunately, plaintiff was forced to drop the issue and Gantt continued to come to work with the strong odor of smoke on her body and clothes until the day the company terminated her.

33.    That in the summer of 2022 Gantt engaged in a couple isolated incidents of making inappropriate remarks in the workplace. One incident involved Gantt asking a female employee (and perhaps others) if their boobs smelled like hot dog water when they sweated – if anything, an incredibly juvenile remark. But again, they were isolated comments, no one was offended, no one reported the conduct, and it stopped.

34.    That throughout 2021 and into the fall of 2022, the Goose Creek Walgreens Store 11434, which was also a vaccine clinic site, was incredibly busy as it was administering COVID vaccines to around 100 patients a day, and it was still taking walk-ins for flu and many other vaccines. This meant that the technicians at the store were very busy, working extra hours, and earning extra income.

35.    That for her part during this period of time, Gantt was working approximately 55 hours a week which, of course, included 15 hours of overtime pay at time and a half. For a technician, this was a good amount of money. However, by the fall of 2022, the demand for COVID vaccines had slowed down and corporate reduced the technician budget hours at plaintiff's store. Thereafter, Gantt's hours decreased from greater than 50 hours a week down to about 30 hours per week – a significant reduction by any measure. Of course, this meant Gantt would be earning significantly less income.

36.    That understandably not pleased with the circumstance, Gantt immediately began to take steps to mitigate her loss in pay by attempting to become a senior or a state-certified technician. If Gantt could do this, she would receive a $1 an hour raise.

37.    That Gantt had two different routes she could take to obtain her raise.  One way was to simply have the plaintiff, as the Pharmacy Manager, and perhaps one of plaintiff's supervisors, sign a senior technician checklist, which described, among other things, the duties that a senior technician had to be able to perform in a proficient manner.  The form further required that the technician be able to fully perform ***all*** of the tasks listed on the form in a proficient manner.  Once the form was signed, Gantt would automatically become a senior technician and receive her dollar-an-hour raise.

38.    That the other way for Gantt to receive the raise was to become a state-certified technician.  To obtain this designation she would have to meet the following three (3) requirements:  (1) work in a pharmacy for 1,000 hours, (2) pass the national test administered by the Pharmacy Technician Certification Board (or "PTCB"), and (3) pass a Board of Pharmacy approved technician class – a class defendant provided to its employees.

39.    That taking the faster route, Gantt first tried to have plaintiff sign off on the senior technician checklist.  In this regard, sometime in or around mid-November of 2022, Gantt approached plaintiff, handed him the form, and directed plaintiff to sign it.  Plaintiff briefly reviewed the form and then asked Gantt if she felt she could proficiently perform all of the tasks identified on it.  Gantt responded in the affirmative.   Not convinced, and pursuant to plaintiff's duties as a pharmacist, plaintiff picked out four (4) or five (5) individual senior technician duties from the form and asked Gantt if she could proficiently perform each task.  In response, Gantt responded "no" to each task plaintiff asked her about.  In plaintiff's opinion, Gantt was not ready to be a senior technician, given she freely admitted to plaintiff that she was unable to proficiently perform four (4) or five (5) senior technician tasks listed on the form and given that the language on the form expressly stated that a senior technician had to be ***fully*** proficient at performing ***all***

tasks listed. (emphasis supplied). As such, plaintiff politely told Gantt that, under the circumstances, he could not sign the form, but that he would be glad to help train her in any of the senior technician tasks or duties she was not able to proficiently perform. In response to the rejection, Gantt became irritated, disgruntled and angry at plaintiff.

40.    That about just one week later (sometime during the week before Thanksgiving in November of 2022) Gantt again came to plaintiff, told him that she could now perform all of the tasks listed on the form, and directed plaintiff to sign it. In the meantime, in the week between Gantt's first and second requests, Gantt had only worked three (3) shifts at plaintiff's pharmacy and she had not approached plaintiff or anyone else at the pharmacy to assist her in becoming proficient at performing any of the senior technician job duties. Plaintiff was surprised by the short period of time between Gantt's two requests, especially given her lack of effort to seek help in performing the senior technician duties in the interim. Still, to be fair, plaintiff chose one of the easier senior technician duties off of the checklist - completing an auto vendor return, and asked Gantt to try and do it. Gantt tried to perform the task but was unable to do so. Thus, again plaintiff advised Gantt that he still could not sign the senior technician form for her. After this second rejection, Gantt became even more irritated and angry at plaintiff and her antagonism toward plaintiff increased. Still, the whole time and thereafter, plaintiff had instructed his pharmacist Huiet and his Operations Manager Adkins to help train Gantt on senior technician duties, and they tried, but Gantt had no interest or motivation to undertake the training.

41.    That after plaintiff declined to sign Gantt's senior technician checklist form for a second time, Gantt pivoted and began to take steps to pursue the other route to obtain her raise, state certification. By in or around December of 2022, Gantt had apparently accomplished

all of the requirements for obtaining her state certification, and all she had left to do was to have plaintiff sign and notarize an affidavit certifying she had worked at plaintiff's store for the requisite number of hours. Of course, plaintiff was happy to sign the affidavit. After all, Gantt met all the requirements for state certification.

42.    That sometime on or about December 12-14, 2022, Gantt handed plaintiff the affidavit and told plaintiff to sign it and to have it notarized. Plaintiff told Gantt he would do so. While it was easy enough for plaintiff to sign the affidavit, getting it notarized proved to be a difficult task, especially given plaintiff's work schedule and given that it was the holiday season. Not only that, but on or about Friday, December 16, 2022, plaintiff noticed that Gantt had failed to properly complete her affidavit. As such, plaintiff immediately advised Gantt of the deficiency and instructed her to retrieve the affidavit from him and fix the deficiency – which Gantt did immediately. Thereafter, plaintiff worked Saturday, December 17, 2022. Plaintiff was off Sunday, December 18, 2022 but worked Monday, December 19, 2022. On that day (December 19, 2022) Gantt returned her properly completed affidavit to plaintiff. Plaintiff worked a full day Tuesday, December 20, 2022. Early on Wednesday, December 21, 2022, plaintiff went back home to Alabama for the Christmas holidays, returning to the Charleston area late Christmas night, December 25, 2022, and reporting to work in the afternoon of the next day, December 26, 2022.

43.    That on or about December 26, 2022, while driving into work that day, plaintiff stopped by the Wells Fargo Bank to get the affidavit notarized. Unfortunately, the bank was closed that day for the Christmas holidays, so plaintiff was unable to get the affidavit notarized.

44.    That later, on or about December 26, 2022, plaintiff had a telephone conference with Longo, the pharmacist that Gantt had been confiding in.  Longo told plaintiff that, according to Gantt, Gantt had already made a complaint against plaintiff to Landrum about her affidavit not yet being signed.  In response, (according to Longo), the first question Landrum asked Gantt was whether she thought plaintiff's alleged conduct towards her was based on race – even though Gantt never brought up the issue.  Of course, Gantt told Landrum that plaintiff's conduct was not based on race.  As it turns out, Gantt's complaint to Landrum against plaintiff was misplaced, if not false.  Plaintiff was diligently attempting to get Gantt's affidavit notarized.  Still, the information from Longo was concerning as, given the nature of it, one would expect a manager at Landrum's level to question the employee on the substance of the underlying complaint  - not automatically accept the employee's allegation against a manager as true, then ask the employee if the manager's conduct was illegally motivated – especially if the employee never brought it up to begin with.  Indeed, Landrum's first question to Gantt shows an effort to put theories into Gantt's head, an animus against plaintiff (or males) and a desire to get rid of plaintiff.

45.    That otherwise, throughout November and December of 2022, plaintiff would raise his concerns to his Store Manager, Becker, that whenever female pharmacy technicians would make a false or trivial complaint against male pharmacists and Pharmacy Managers, Walgreens would blindly support the female employee, fire or demote the male employee, and always replace the male employee with a female.

46.    That sure enough, during the last week of December 2022,  and consistent with the start of an intra-corporate investigation, plaintiff's Store Manager advised plaintiff that Landrum had moved Gantt out of plaintiff's store and placed her in Walgreens Store 18351 on

St. James Avenue in Goose Creek, South Carolina while, at the same time, assigning a new technician from another pharmacy to work at plaintiff's store location.

47.    That incredibly, on two (2) separate occasions during that week Gantt blatantly disregarded the directions of a District Manager (Landrum) and, instead of reporting to her newly-assigned store as directed, Gantt showed up at plaintiff's pharmacy on one occasion and at a different Goose Creek Walgreens Pharmacy on the other occasion.  There is evidence that Landrum was advised about Gantt's two (2) separate incidents of intentional insubordination – a universally terminable offense – and that, while Landrum was upset over the serious work rule violations, she did not discipline or even admonish Gantt for either event.

48.    That in the meantime, plaintiff continued to try and get Gantt's affidavit notarized, but plaintiff was still plagued by a busy schedule and the holidays.  After plaintiff's unsuccessful attempt to have Gantt's affidavit notarized on December 26, 2022, plaintiff worked full days on December 27, 28, 29 and 30, 2022 and did not have time to complete the task on those days.

49.    That on or about December 30, 2022, while plaintiff was working in the pharmacy, he noticed that Gantt and plaintiff's Store Manager, Becker, were engaged in conversation about four to five feet away from plaintiff, close enough for plaintiff to hear the conversation.  First plaintiff heard Gantt falsely suggest to Becker in a snide, accusatory manner, that plaintiff was intentionally refusing to sign her affidavit and asking Becker if Walgreens would pay for a traveling notary to come to the store to notarize her affidavit.  Gantt continued with her false allegations, ultimately expressly accusing plaintiff of intentionally dragging his feet in getting the document notarized.  Plaintiff then heard Becker respond that she did not believe plaintiff would intentionally engage in such unprofessional conduct.  At that point

plaintiff entered into the conversation and assertively stated words to the effect that Gantt's accusation was false; plaintiff further explained his busy work schedule from the time he received the affidavit from Gantt up until that day; and plaintiff advised the two women that he tried to get the affidavit notarized on December 26, 2022, but that the bank was closed that day for the holidays.

50.    That while driving to work on or about January 2, 2023, plaintiff again stopped by the Wells Fargo Bank to get the affidavit notarized.  Unfortunately, this time the bank was closed for the New Year's Day holiday, so plaintiff was unable to get the affidavit notarized.

51.    That on or about January 3, 2023, plaintiff again worked a full day.  On that day, plaintiff noticed that his Store Manager, Becker, was taking several pharmacy technicians from the Pharmacy into an office where (plaintiff later found out) they were being interviewed by Breece about the false complaints Gantt had made against plaintiff.  Breece conducted the interviews via video conferencing while Becker sat in the office, apparently as a witness. Plaintiff observed that, when the technicians left the interview office, they looked angry.  Later that day or evening plaintiff again spoke on the phone to Longo, the pharmacist Gantt had been confiding in.  Longo told plaintiff in the form of "friendly advice" that plaintiff should get Gantt's affidavit notarized as soon as possible - a task plaintiff had been trying to accomplish for weeks.

52.    That plaintiff worked a full day on January 4, 2023.  He was off from work the following day, January 5, 2023 and finally on that day plaintiff was able to get the affidavit notarized.

53.    That the next day, January 6, 2023, plaintiff brought Gantt's affidavit to work with him and placed it on the counter in a spot where Gantt usually worked.  Plaintiff also

told Gantt that day that her affidavit was notarized and told her where he had put it. Despite working various shifts in the store thereafter, Gantt did not take the affidavit home for another four to five days – which was hard for plaintiff to understand, given the urgency Gantt placed on the task and the fact that she falsely reported plaintiff for not timely getting her affidavit signed and notarized.

54.    On or about January 9, 2023, plaintiff was called into a meeting attended by his store manager, Becker, and by Breece, the Manager of Asset Solutions, a loss prevention position. Breece was attending the meeting via video conference call, while Becker attended in person. No one from Human Resources attended the meeting, but Breece explained that she was temporarily performing human resource duties, as the HR Department was busy and short on employees. During the meeting Breece asked plaintiff a lot of questions surrounding his interactions with Gantt, while Becker essentially looked on. Knowing he had not violated any company rules, and consistent with the duties plaintiff had to the defendant as a Pharmacy Manager, plaintiff was open and forthcoming in answering Breece's questions.

55.    That some of the questions Breece asked plaintiff included, but were not limited to:

- ❖ Whether plaintiff told Gantt she could not smoke - (plaintiff did not);

- ❖ Whether plaintiff ever told Gantt she smelled like smoke or perfume - (plaintiff did);

- ❖ If so, did plaintiff raise his voice during the conversation – (plaintiff did not);

- ❖ Whether plaintiff ignored Gantt – (plaintiff did not);

- ❖ Whether Gantt had asked plaintiff to teach her tasks on the senior technician checklist – (she had not);

❖ Whether plaintiff was upset on December 30, 2022 when he overheard Gantt accusing him of intentionally not signing her affidavit – (plaintiff was not, but he was concerned about her false remarks); and

❖ Other related questions.

56.  That it is clear from the content of the questions that Gantt had reported plaintiff and, in doing so, she conveyed her false narrative to Landrum.  Still, plaintiff openly responded to all questions asked and additionally he summarized Gantt's work history in his pharmacy, explaining that she started at plaintiff's store with some conduct issues involving inappropriate remarks, like the ones referenced herein, but that ultimately, plaintiff and his team were able to get her to start acting in a more appropriate manner after about two (2) or three (3) months at the store.

57.  That plaintiff also told her that, when Gantt complained to Landrum about him, Landrum's first question to Gantt was whether she thought plaintiff's alleged conduct was due to race.  Plaintiff further explained that he was somewhat hesitant to report Gantt because, if he did, he would be falsely accused of being a racist and a bigot and would likely become the target of Human Resources like at least two (2) other male pharmacists or Pharmacy Managers who were demoted or fired without cause after female technicians made false complaints about them.  Plaintiff even specifically named the two male employees.

58.  That near the end of the interview, plaintiff stated to Breece that Gantt told the Store Manager, Becker, that she (Gantt) had been evicted from several apartments she had rented; that as a result she was having issues renting an apartment; and that, as such, she had purchased and used stolen social security numbers or cards to rent her current apartment.  Of course, Becker never reported this to Human Resources or upper management, despite the fact that Gantt had confessed to committing a crime and the troublesome circumstances that, as a

pharmacy technician, Gantt had access to the social security numbers of many of the store's Medicare customers.  Plaintiff did not bring up the incident when Gantt used the word "nigga" to him because Breece never asked plaintiff about it and it was the furthest topic from plaintiff's mind.

59.    That before the interview concluded, Breece asked plaintiff to summarize in an email the questions he was asked during the meeting and his answers.  Breece even sent plaintiff an email itemizing each question she had asked plaintiff during the interview.  She did **not**, however, tell plaintiff that he was free to or that he was permitted to add or elaborate on his written answers.  Instead, plaintiff was instructed to write his answers out just like he said them in the interview.  Plaintiff did as instructed and, in short order, prepared and sent the email to Breece.  (Plaintiff is in possession of an audio recording of the above meeting.)

60.    That at the same time, plaintiff understands that the store's Pharmacy Operations Manager, Adkins, was also interviewed in the course of the investigation.  Plaintiff further understands that during her first interview with Breece, Adkins reported that she had heard Gantt make several different inappropriate remarks in the workplace, including use of the word "nigga."  Apparently this information (Gantt's use of the word "nigga") resulted in Breece calling some of the witnesses back for a brief second interview, including plaintiff.

61.    That on or about January 17, 2023, plaintiff was called back in for a second interview with Breece.  Just like before, Breece attended this meeting via video conference and Becker was physically in the room with plaintiff.  As before, Breece asked all the questions but, unlike before, this interview was extremely short in duration and limited in scope to just one issue.  Right off the bat, Breece asked plaintiff if he ever heard Gantt "use the 'n' word."  Plaintiff had not thought about the incident since it happened about two (2) years ago and was

caught entirely off guard by the question.  Still, plaintiff tried his best to remember it on such short notice.  Stumbling a bit and trying to remember the incident as he spoke, plaintiff truthfully responded that he probably had heard Gantt use the term but that, if he did, she used the word "nigga" not "nigger."  In response to further questions, plaintiff said that he only heard Gantt use the word on one occasion and on that one occasion Gantt used the term in a joking or innocuous manner – not in a way where she was calling another person by that name.  Otherwise, given that plaintiff had totally forgotten about the one-time, isolated event and that he was not given sufficient time to put his thoughts together, plaintiff further stated that he could not remember when she said it or the context in which it was said (though since the meeting, plaintiff has remembered the timing and context of the incident). Breece also asked plaintiff if he reported the incident, to which plaintiff responded in the negative.  When asked why, plaintiff explained he did not report it because Gantt (a Black woman) used the form of the word which ends in an "a" in a joking manner and in a context where she was not calling another employee a "nigger" or even a "nigga."  Breece further asked plaintiff some questions about his disciplinary practices at his store and whether plaintiff had disciplined any of his employees at the store within the past year.  Thereafter, the meeting ended with Breece asking plaintiff to prepare another written statement. Of course, plaintiff did so. (Plaintiff is also in possession of an audio recording of this interview.)

62.    That in further regard to the investigation, plaintiff understands that Becker, the Store Manager at plaintiff's store (the Goose Creek store) was not interviewed during the investigation.  This is a suspicious omission given that she was the Store Manager, she interacted with Gantt on a daily basis, and she could have corroborated some of the statements plaintiff made to the investigators.  For example, plaintiff has evidence Becker, too, heard Gantt use the

word "nigga" in the workplace (or knew about it) and did not report it.  And, she likewise failed to report the serious offense of Gantt using false social security numbers or cards to rent an apartment.

63.    That apparently the investigation concluded sometime in mid to late January of 2023.

64.    That on or about February 1, 2023, Becker called plaintiff to a third meeting, again in an office in plaintiff's store.  However, this time, Becker was there in person along with a District Manager from Hilton Head, South Carolina, but he did not participate in the meeting.

65.    That once the meeting commenced, Landrum wasted little time in telling plaintiff that, after reviewing all the information gathered from the recent investigation, they had made the decision to terminate plaintiff's employment, effective immediately (just three (3) weeks after plaintiff engaged in protected activity).  Landrum continued that plaintiff's termination was based on a violation of defendant's standards of conduct, specifically the harassment/discrimination policy, because plaintiff heard Gantt use the word "nigga" in the workplace and no one, including plaintiff, reported it.  (See Paragraph 28(j) above for a summary of the incident.)

66.    That to say plaintiff was surprised by the decision would be an understatement.  In fact, the first words out of plaintiff's mouth were, "Are you joking?"  The next words out of plaintiff's mouth were that he only heard Gantt say the word *one time.* Landrum responded by disclaiming that she was a party to the investigation, and that information had surfaced during the investigation that Gantt had called customers "niggas." Plaintiff responded in clear terms that he had absolutely no knowledge whatsoever of any such incident

where Gantt called a customer a "nigga."  Plaintiff never witnessed any such incident and no one ever reported any such incident to plaintiff.

67.    That in what seemed like an afterthought (or a reaction to the points plaintiff was making in defending himself in the termination meeting), Landrum then referred to Gantt's other comments like the "hot dog water" remark and others and told plaintiff he also failed to address this "other" conduct with Gantt and failed to report it.  Still in disbelief, plaintiff told Landrum that, if issues did go unaddressed with Gantt, it was because anytime anyone in management attempted to do so, Gantt would accuse them of being a racist.  Plaintiff then stated that he was being fired because he was a white male.  Throughout the meeting Landrum was rushing plaintiff, interrupting him, and not giving plaintiff a chance to speak, leaving plaintiff without a chance to state that he had addressed Gantt's conduct issues directly with her on at least two (2) separate occasions during Gantt's first three (3) months at the store and that her conduct improved; that plaintiff did, indeed, report Gantt's conduct to his District Manager at the time, Garner, by sending him text messages on the issue; and that plaintiff continuously reported Gantt's conduct to his Store Manager, Becker, and asked for her help.

68.    That ultimately, the meeting concluded, plaintiff retrieved his belongings and left the premises. (Plaintiff is in possession of an audio recording of his termination meeting.)

69.    That after plaintiff's termination defendant replaced plaintiff with a female, Tiffany Taylor ("Taylor").

70.    That on or about February 7 and 8, 2023, plaintiff filed a grievance appealing his termination to an Employee Relations Specialist, Melissa Wong out of Deerfield, Illinois.  In the process, Wong asked plaintiff to send her documentation or screenshots to

support his position, which plaintiff did by sending screenshots of text messages he had sent to his prior District Manager, Garner, reporting Gantt's conduct.

71.    That Wong agreed that plaintiff had, in fact, documented that he reported Gantt's conduct to his District Manager (thereby disproving the second reason defendant gave to plaintiff for his termination).  However, Wong also advised plaintiff that his termination would be upheld because he did not report the "nigga" comment Gantt made.  (See Paragraph 28(j) above for a summary of the incident.)

72.    That thereafter, plaintiff struggled with the reasons he was given for his termination.  Plaintiff had only heard Gantt make the remark one time, two years ago, in a joking manner directly to plaintiff and in a private setting when no one else was around.  It seemed odd and arbitrary that plaintiff would be fired over such a random, isolated incident he had entirely forgotten about.  As such, on or about February 15, 2023, plaintiff sent a text message to his former Operations Manager, Adkins, advising her of his termination and trying to get some understanding of what happened.  That same day, (on or about February 15, 2023) Adkins responded to plaintiff's text message revealing that she, too, had been interviewed and that during it she had told Breece that she had heard Gantt use the word "nigga" as well as other offensive words in the workplace, and that her information could have been responsible for Landrum's extreme focus on the comment.  Like plaintiff, Adkins never reported Gantt's use of the term "nigga" to upper management or Human Resources.

73.    That as Pharmacy Operations Manager, Adkins supervised the eight (8) or nine (9) technicians at plaintiff's pharmacy, including Gantt.  In fact, she was their **_direct_** supervisor; she gave them performance evaluations; and, like plaintiff, she had the authority to hire, discipline and fire the technicians.  Also, like plaintiff, she was a management-level

employee and she was subject to the same work rules as plaintiff. And, just like plaintiff, when Adkins heard Gantt use the term "nigga" in the workplace, she did not report it. Unlike plaintiff, Adkins is a female and outside of plaintiff's protected class. Also unlike plaintiff, Adkins was not fired for her failure to report Gantt's use of the word "nigga" in the workplace. Thus, Adkins and plaintiff engaged in the same alleged misconduct and, while plaintiff, a male, was fired, Adkins, a female, was not and was thereby treated more favorably by defendant. In all events, plaintiff understands that Adkins resigned from defendant approximately two weeks after plaintiff's termination, at least partially in protest over plaintiff's firing.

74.    That Becker, the Store Manager, likewise heard Gantt use the term "nigga" in the workplace (and/or she knew about it) and did not report it. Becker also knew Gantt was using stolen social security numbers or cards and she failed to report that to upper management or to Human Resources. Thus, like Adkins, when Becker engaged in conduct that was similar to (if not the same as) the offense plaintiff was fired over, she was not fired or even disciplined.

75.    That moreover, the two (2) reasons given to plaintiff for his termination, if there even was more than one reason, are false or unworthy of credence. The first (and primary) reason given to plaintiff for his termination was that he violated defendant's harassment and discrimination policies by failing to report Gantt's use of the term "nigga." However, this reason is false and/or it lacks credibility as plaintiff never violated any of defendant's harassment or discrimination policies, if they even existed. Plaintiff heard Gantt (a Black woman) use the word "nigga" one time, in a joking and complimentary context (and in a private setting), some two (2) years prior to his termination. In the first instance, the word "nigga" is not a racist term, but rather some dictionaries define it as a term of endearment. For that matter, conventional wisdom (and common sense) holds that the meaning of the word is often ascertained by the race of the

26

person uttering it, i.e., when an African-American uses it the word tends to be less likely to have a discriminatory meaning. No reasonable person could conclude that Gantt's use of the word "nigga" on one occasion (by a Black woman) in a joking or complimentary context constitutes race discrimination or the violation of a harassment or discrimination policy.

76.    That the harassment and discrimination policies that plaintiff found after his termination state that plaintiff only had a duty to report an incident if he ***believed*** that he had ***experienced*** or ***observed*** discrimination or harassment. The policy goes on to define "discrimination" as "occurring when a person is treated less favorably than others because [they are] in a protected class." It describes harassment as "unwanted conduct related to a …protected characteristic which has the purpose or effect of violating an individual's dignity or creating [an] intimidating, hostile, degrading, humiliating or offensive environment for that individual."

77.    That first, plaintiff never received these policies or any other harassment or discrimination policy while at defendant; he was never told about or instructed to review these policies or any other policy; and plaintiff was not trained on these or any other discrimination or harassment policies at defendant. Plaintiff should not be held accountable for allegedly breaching a policy he did not receive or know about.

78.    That in addition to the above, plaintiff never breached (or failed to follow) the policy in any manner. When plaintiff heard Gantt use the word "nigga" to him, on one occasion, in joking manner, and in a private setting, plaintiff did not believe Gantt was treating him or anyone else outside of her protected class differently. (As it turned out, she used the term around or to everyone, regardless of position held, race or gender.) And Gantt using that word to plaintiff one time did not violate plaintiff's or anyone else's dignity or create an intimidating or

hostile work environment for plaintiff or anyone else in the store outside of Gantt's protected class.

79.    That under the terms of defendant's own discrimination and harassment policies, Gantt never harassed plaintiff and she never discriminated against plaintiff or anyone else.  Thus, she did not violate whatever discrimination policy defendant may have had in place.  This means plaintiff did not violate any such policy in not reporting the technician to Human Resources or anyone else.

80.    That besides, discrimination policies typically require that any such complaint or report be made in good faith.  Had plaintiff reported Gantt's isolated "nigga" remark as a violation or potential violation of defendant's discrimination or harassment policy, then plaintiff could have been disciplined or fired for making a bad-faith report.

81.    That as such, Gantt had not engaged in discriminatory conduct when she used the term to plaintiff and plaintiff did not violate any harassment policy by not reporting it.  In addition to the above, there is no meaningful harassment/discrimination policy in defendant's Code of Conduct and defendant failed to provide Pharmacy Managers with adequate training on race harassment and discrimination.

82.    That the second reason defendant may have given to plaintiff for his termination (that plaintiff failed to address Gantt's other conduct with her and/or failed to report it) is also false and/or not credible.  First, it was not a reason which defendant initially gave to plaintiff for his termination.  Rather, Landrum only brought it up after plaintiff objected to the first reason given to him for his termination.  Moreover, plaintiff did, indeed, admonish Gantt on two (2) separate occasions about her conduct during the first three (3) months she was at plaintiff's store, and her conduct improved; plaintiff repeatedly reported Gantt to his District

Manager at the time, Garner, by, among other things, sending Garner text messages (which plaintiffs still has) reporting Gantt's misconduct and plaintiff repeatedly reported Gantt's conduct to his Store Manager, Becker. In addition to the above, after listening to plaintiff and reviewing the text messages he sent to his District Manager, defendant's own Human Resource Department found that he had reported Gantt's "other" misconduct – thereby disproving the second reason defendant gave to plaintiff for his termination.

83.    That in reality, defendant fired plaintiff because of his gender (male) and in retaliation for engaging in protected activity. Among other things, plaintiff's work environment was female-dominated with females occupying every management role in plaintiff's chain of command, including his Store Manager, his District Manager, his Area Manager, and his Regional Vice-President – all the way up to the CEO - with some of these women openly advocating women's rights; and after plaintiff was fired, he was replaced by a female. The reasons given to plaintiff for his termination were false or unworthy of credence as plaintiff never received discrimination or harassment policies at defendant; Gantt never harassed or discriminated against plaintiff or anyone else that plaintiff is aware of; and, she never violated any harassment or discrimination policy defendant may have had in place – thus, plaintiff did not violate any such policy for not reporting her use of the word "nigga" as a violation of some discrimination or harassment policy. Plaintiff also has compelling comparator evidence as, when similarly-situated female employees outside of plaintiff's protected class, such as Adkins, Becker, and others, engaged in the same conduct plaintiff allegedly engaged in, they were not fired; management apparently received bonuses for placing females in management/leadership positions; during the investigation, plaintiff's Store Manager was not interviewed – an irregularity that circumstantially points to discrimination as she had information that could have

helped plaintiff; when Gantt went to Landrum with false complaints about plaintiff, Landrum immediately asked Gantt if she thought plaintiff's conduct was on account of Gantt's race, a question which suggested an answer to Gantt and which showed Landrum was looking for a reason to get rid of plaintiff.   And, plaintiff accurately observed that every time a male pharmacist, Pharmacy Manager or District Manager was fired or resigned, that they were replaced by females, e.g., Landrum replaced Garner; Taylor replaced plaintiff; just recently the male pharmacist at Walgreens on Ashley Phosphate Road and Dorchester Road in North Charleston, South Carolina, Anh Quoc Pham Nguyen, was replaced by a female, Madelyn Warren; and there are at least two (2) more such examples of a male Pharmacy Manager being replaced by a female in plaintiff's district.  Finally, plaintiff was fired three (3) weeks after he engaged in protected activity.

**FOR A FIRST CAUSE OF ACTION**
**VIOLATION OF TITLE VII**
**TERMINATION BASED UPON GENDER**

84.    That plaintiff hereby repeats and realleges each and every allegation in Paragraph 1 – 83 hereinabove as fully as if set forth verbatim.

85.    That at all pertinent times as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII and is otherwise subject to Title VII.

86.    That the plaintiff is a male and, thus, is a member of a protected class.

87.    That plaintiff performed his job duties at defendant in a manner that met and exceeded defendant's reasonable and legitimate expectations, as plaintiff received the following overall scores on his last three (3) performance evaluations at defendant:  2020: "meets expectations;" 2021: "above-satisfactory;" and 2022: "above-satisfactory."  Plaintiff's

last evaluation, given to him in or around September of 2022 wherein plaintiff received an overall rating of "above-satisfactory" was given to plaintiff only around five (5) months before plaintiff was wrongfully fired and the author of it told plaintiff it (his 2022 evaluation) was one of the best in the area.  Moreover, plaintiff's supervisors routinely complimented him on his job performance, plaintiff received awards for his performance, he was well liked by his staff and customers, and he had a history of growing the pharmacies he worked at into high-volume stores.

88.    That despite the above, on or about February 1, 2023 defendant fired plaintiff without prior warning, notice or cause and for reasons that were false and/or unworthy of credence.

89.    That at no time did plaintiff violate any of defendant's harassment, discrimination or standards of conduct policy if, in fact, defendant had any such policies and plaintiff did, indeed, report Gantt's "other" conduct.  Indeed, defendant's Employee Relations Specialist even agreed with plaintiff, that plaintiff had, in fact, reported Gantt's "other" misconduct.

90.    That in addition to the above, after firing plaintiff defendant replaced plaintiff with a female (an employee outside of plaintiff's protected class).

91.    That moreover, as alleged, defendant treated similarly-situated female employees more favorably than it treated plaintiff and, therefore, plaintiff can rely on comparator evidence.  Specifically, the Pharmacy Operations Manager, Adkins, and the Store Manager, Becker, as well as others, are all female; they all heard Gantt use the word "nigga;" they all failed to report it; and yet they were not fired.

92.    That in addition to the above, an overwhelming majority of defendant's upper-management employees were (or are) female, all upper-level employees in plaintiff's

chain of command were female, some of which are outspoken women's rights advocates, and bonuses at defendant were based in part on the ability to recruit female managers. At the same time, a pattern and practice existed at defendant whereby competent male supervisory employees would be demoted or fired whenever a female made a complaint about them, regardless of the merit of the complaint, and they would then be replaced by females. And, when Gantt first reported plaintiff to plaintiff's supervisor, Landrum, Landrum immediately attempted to get Gantt to falsely frame her complaint against plaintiff as a racial complaint before Landrum even heard Gantt's complaint. Even Gantt refused to frame her complaint against plaintiff in such terms. In fact, Gantt's underlying complaint did not have merit.

93.    That as such, defendant fired plaintiff because of his gender (male) and, as such, has violated The Civil Rights Act of 1964, Title VII (42 U.S.C. § 2000e-2 and 5).

94.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

95.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, knowingly, and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF TITLE VII**
**RETALIATION**
**42 U.S.C. § 2000e-3**

96.    That plaintiff hereby repeats and realleges each and every allegation in Paragraph 1 – 95 hereinabove as fully as if set forth verbatim.

97.    That at all pertinent times as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII and is otherwise subject to Title VII.

98.    That all throughout November and December of 2022 plaintiff engaged in protected activity by repeatedly reporting to his Store Manager, Becker, that whenever a female pharmacy technician raised a complaint against a male pharmacist, Pharmacy Manager, or even a District Manager, defendant would always side with the female employee, regardless of the merit of the complaint, demote or fire the male supervisor, and then replace him with a female employee.

99.    That on or about January 9, 2023, plaintiff again engaged in protected activity under Title VII during his first interview in regard to Gantt's complaint against him by telling his female interviewers, Becker and Breece, that Walgreens had a pattern and practice of demoting and firing male pharmacists and male Pharmacy Managers without cause whenever a female pharmacy technician would make a false or meritless complaint against them and then replacing the male employees with females.  Plaintiff even gave his interviewers two (2) specific examples of when this occurred, even providing the names of those involved.

100.    That plaintiff was fired on February 1, 2023, just three (3) weeks after last engaging in protected activity, all without notice, warning or cause, and for false reasons and/or reasons unworthy of credence.  As such, based upon this timing evidence and the other facts

alleged herein, a causal connection exists between plaintiff's protected activity and his termination.

101.   That moreover, the reasons defendant gave to plaintiff for firing him were false and/or unworthy of credence, and defendant treated similarly-situated females more favorably than it treated plaintiff.

102.   That defendant really fired plaintiff in retaliation for engaging in protected activity by opposing conduct made illegal by Title VII, and thereby violated 42 U.S.C. § 2000e-3.

103.   That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

104. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, knowingly, and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, as to all claims alleged herein, plaintiff prays for judgment against the defendant for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including his reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: _s/A. Christopher Potts_
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**_Attorneys for the Plaintiff_**

Charleston, South Carolina
November 19, 2024